| CINDY ALEGRE et al., | Case No.: 16-CV-2442-AJB-KSC |
|---|---|
| Plaintiffs, | Case No.: 17-CV-0938-AJB-KSC |
| v. | Case No.: 17-CV-1149-AJB-KSC |
| SALLEY JEWELL, Secretary of the Department of Interior, United States of America, in her official capacity, et al., | **ORDER:** |
| Defendants. | **(1) GRANTING MOTION TO DISMISS IN 16-CV-2442 UNDER RULE 8(a), (Doc. No. 20);** |
| CINDY ALEGRE et al., | **(2) GRANTING DEFENDANTS' MOTION TO DISMISS IN 17-CV-0938, (Doc. No. 20); AND** |
| Plaintiffs, | |
| v. | **(3) GRANTING PLAINTIFFS' MOTION TO CONSOLIDATE IN ALL THREE CASES** |
| UNITED STATES OF AMERICA et al., | |
| Defendants. | |

CHRISTINA ALVARADO et al.,

                                        Plaintiffs,

v.

UNITED STATES OF AMERICA et al.,

                                        Defendants.

Presently before the Court are motions in three companion cases. In Case No. 16-CV-2442, Defendants have filed a motion to dismiss. In Case No. 17-CV-0938, Defendants have filed a motion to dismiss Plaintiffs' request for preliminary injunction and the complaint for lack of subject matter jurisdiction. In all three cases, Plaintiffs filed motions to consolidate. The Court rules as follows: Defendants' motion to dismiss in ***Case No. 16-CV-2442*** is **GRANTED** and Plaintiffs' complaint is **DISMISSED** pursuant to Rule 8(a) of the Federal Rules of Civil Procedure.[1] Defendants' motion to dismiss in ***Case No. 17-CV-0938*** is **GRANTED**, the temporary restraining order entered May 18, 2017, is **DISSOLVED**, and Plaintiffs' complaint is **DISMISSED**. Plaintiff's motions to consolidate filed in all three cases are **GRANTED**.

Plaintiffs are **ORDERED** to file a consolidated complaint in the lead case, Case No. 16-CV-2442. This complaint must be filed no later than ***thirty days*** following this order's issuance. Failure to comply with Rule 8(a) may subject Plaintiffs' complaint to dismissal with prejudice.

## BACKGROUND

The three cases arise from overlapping facts. Because the facts are most intelligible when the complaints are read together, the Court pulls its recitation of the facts in this order

---

[1] All references to "Rules" are to the Federal Rules of Civil Procedure.

from all three cases.[2] This lawsuit centers on a century-old dispute over tribal identity. Plaintiffs are the descendants of Jose Juan Martinez ("Jose"), Guadalupe Martinez ("Guadalupe"), and their daughter Modesta Martinez Contreras ("Modesta") (collectively, "Martinez Ancestors"). (*Alegre I* Comp. ¶¶ 71–203.) Plaintiffs assert each of the Martinez Ancestors was a full blood San Pasqual Indian. (*Id.* ¶¶ 291, 333, 353, 356, 368; *see id.* ¶¶ 344–50.)

The instant dispute dates back to the late 1800s and early 1900s. After the Band was driven from its aboriginal land, the United States government designated land in another township for the Band. (*Alegre II* Comp. ¶¶ 16, 18.) Though the land was filled with rocks and had little or no water, it was still valuable, and squatters remained problematic. (*Id.* ¶ 18.) To deal with this issue, Amos Frank, then Indian Superintendent of the Mesa Grande Tribe, hired a man named Frank Trask as a "police private and Judge" to preserve the San Pasqual reserve. (*Alegre I* Comp. ¶¶ 233–34, 513; *Alvarado* Comp. ¶ 126.) Frank Trask was the son of Rosewell Trask, a white man, and Mattiana Martha Warner Trask, a Mexican woman. (*Alegre I* Comp. ¶ 232; *see id.* ¶ 241; *Alvarado* Comp. ¶ 125.) Frank Trask married Lenora LaChappa, a Mesa Grande Indian woman. (*Alegre I* Comp. ¶¶ 232, 386; *Alvarado* Comp. ¶ 125.) Accordingly, while Trask Descendants have some Indian blood, Plaintiffs allege they have no San Pasqual Indian blood. (*Alegre I* Comp. ¶¶ 236, 272, 343.)

Amos Frank relocated Frank Trask and his family onto the San Pasqual reserve in 1910. (*Id.* ¶¶ 234.) Though Frank Trask's employment ended within a year, the Trask

---

[2] While the Court generally cites to the blue CM/ECF-generated document and page numbers, doing so in this order becomes unwieldy. Accordingly, the Court uses the following citations: Citations to the amended complaint in Case No. 16-CV-2442, (Doc. No. 13), are denoted as "*Alegre I* Comp.," citations to the complaint in Case No. 17-CV-0938, (Doc. No. 1), are denoted as "*Alegre II* Comp.," and citations to the complaint in Case No. 17-CV-1149, (Doc. No. 1), are denoted as "*Alvarado* Comp."

family remained on the land as squatters for the next 40 years and prevented the Band from coming onto the reservation. (*Id.* ¶¶ 235, 422; *Alvarado* Comp. ¶¶ 55, 78, 178, 185.)

In the 1950s, the Band started to formally organize itself. (*Alegre II* Comp. ¶ 209.) The Band worked with anthropologist Dr. Florence Shipek to assemble the documentation necessary to establish Band membership. (*Id.* ¶ 209.) Dr. Shipek worked with the Band's Enrollment Committee, which was then comprised mainly of members who were unquestionably of San Pasqual descent. (*Id.*) However, it also included two members not of San Pasqual descent, including Florence Wolf Trask, the daughter of Frank and Lenora Trask. (*Id.* ¶¶ 17, 209.)

On July 29, 1959, the BIA published, and the Band approved, the Proposed Rule governing Enrollment of the San Pasqual Band of Mission Indians in California. (*Alegre I* Comp. ¶¶ 59, 253.) This statute required that persons seeking enrollment in the Band must possess no less than 1/8 blood of the Band. (*Id.* ¶ 253.) Following the Band's approval of the proposed regulation, and unbeknownst to the Band, the rule that was ultimately codified and published at 25 C.F.R. § 48 on March 2, 1960, differed in a significant respect from that which the Band approved. (*Id.* ¶ 255; *Alegre II* Comp. ¶ 25.) The added section, codified at 25 C.F.R. § 48.5(f), read in pertinent part as follows:

> A person who meets the requirements of paragraph (a), (b), or (c) of this section, but whose name has been carried on the census roll of another reservation shall be declared ineligible for enrollment unless he can establish that he has been affiliated with the San Pasqual Band for a continuous period of at least one year immediately prior to January 1, 1959, evidenced by residence on the reservation or through active participation in tribal affairs such as attendance at tribal meetings, and being permitted to vote on matters relating to the San Pasqual Reservation.

(*Alegre I* Comp. ¶¶ 256, 409, 415.) It was suggested that this proposed change "not be made available to the [] Enrollment Committee . . . ." (*Id.* ¶ 60; *see id.* ¶¶ 255, 258, 408.) After 25 C.F.R. § 48 was published, the Enrollment Committee recommended that several Trask Descendants be denied enrollment. (*Alegre II* Comp. ¶ 26.) However, the BIA found the Trask Descendants were eligible for enrollment under § 48.5(f). (*Id.* ¶ 27.)

In 1966, the BIA had prepared and approved the Tribal Membership Roll of the Band, which included several non-San Pasqual people due to § 48.5(f) and a secretarial construction of the phrase "blood of the Band," as used in the C.F.R., to mean "total Indian blood of a person named on the basic membership Roll dated June 30, 1910." (*Id.* ¶¶ 27, 205; *Alegre I* Comp. ¶¶ 65, 396.) The Band objected to the use of the 1910 census because it included Frank and Lenora's children, even though Lenora and her parents were listed on multiple census rolls for the Mesa Grande Tribe. (*Alegre II* Comp. ¶¶ 210, 217.) These actions and interpretations resulted in the admission of Trask Descendants to the Band. (*Id.* ¶ 218.)

Another wave of Trask Descendants and other non-San Pasqual people were enrolled in the Band in 1988.[3] (*Alegre I* Comp. ¶ 286.) In 1950, bands of Indians filed suit against the United States relating to certain land and water rights. (*Id.* ¶ 282.) This came to be known as the Claims 80-A Docket. (*Id.* ¶¶ 282, 284.) The United States settled and paid monies into a trust to be distributed by the BIA. (*Id.* ¶ 284.) To distribute this money, 25 C.F.R. § 76 was published for the sole purpose of bringing the 1966 roll current. (*Id.*) Because the Band purportedly did not have an Enrollment Committee at that time, Tribal Operations Officer Frances Muncy ("Muncy") took unilateral action to make the Band's membership roll current. (*Id.* ¶¶ 286, 288.) Muncy provided this wave of enrollees notice and an opportunity to submit documentation supporting their enrollment. (*Id.* ¶ 287.) These non-San Pasqual persons were subsequently enrolled in the Band, and the money was disbursed. (*Id.* ¶ 289.) At the same time, the Trask Descendants' blood degree was also increased. (*Id.* ¶¶ 288, 290.)

---

[3] It was at this time the Alto Descendants were enrolled. (*Alegre I* Comp. ¶ 286.) The Alto Descendants were later disenrolled. *Alto v. Jewell*, No. 11-cv-2276-BAS (BLM), 2015 WL 5734093, at *23 (S.D. Cal. Sept. 30, 2015) (granting summary judgment and affirming Assistant Secretary's decision to disenroll the Alto Descendants), *aff'd*, 661 F. App'x 502 (9th Cir. 2016).

In 2005, Plaintiffs submitted applications for enrollment to the Enrollment Committee. (*Id.* ¶ 291.) After considering historical documents in its possession, as well as newly discovered documents such as the 1955 San Pasqual Census (the only census to state blood degrees of the San Pasqual Indians), the Enrollment Committee unanimously voted that Plaintiffs had sustained their burden of proof establishing they were qualified for enrollment. (*Id.* ¶¶ 7, 293–95, 431.) This determination was predicated on increasing Plaintiffs' ancestor Modesta's blood degree from 3/4 to 4/4; without that increase, Plaintiffs would not have the requisite 1/8 blood of the Band to qualify for enrollment. (*See id.* ¶¶ 2, 4, 7, 11.) The Enrollment Committee took its determination to the General Council, which agreed with the Enrollment Committee on April 10, 2005. (*Id.* ¶¶ 9, 40, 296, 297, 433.)

On September 12, 2005, the Business Committee wrote to James Fletcher ("Fletcher"), Superintendent of the Southern California Agency, stating it concurred with the Enrollment Committee and General Council. (*Id.* ¶¶ 10, 41, 298, 434.) Ten days later, on September 22, 2005, the Enrollment Committee submitted a letter to Fletcher, requesting that the BIA correct Modesta's blood degree from 3/4 to 4/4 degree San Pasqual blood. (*Id.* ¶¶ 11, 299, 357, 435; *Alegre II* Comp. ¶ 6.)

The BIA did not respond to this letter until December 8, 2005. (*Alegre I* Comp. ¶¶ 5, 13, 301; *Alegre II* Comp. ¶ 7.) In its response, the BIA stated "the preponderance of the evidence does not sufficiently demonstrate that Modesta [] is full blood." (*Alegre II* Comp. ¶ 7.) The letter was sent only to the Pacific Regional Director, Amy Dutschke ("Dutschke"). (*See Alegre I* Comp. ¶ 13.) On January 31, 2006, Dutschke concurred with the BIA that Modesta was not a full blood San Pasqual Indian. (*Id.* ¶¶ 14, 42, 303.) On April 7, 2006, the Acting Assistant Secretary of the Department of the Interior agreed and denied the Band's request to increase Modesta's blood degree. (*Id.* ¶¶ 4, 358, 439.) The April 7, 2006, was final for the BIA. (*Id.* ¶ 17.) Plaintiffs assert that between 2005 and the present, they were never provided written notice of any of these determinations. (*Id.* ¶¶ 17, 18, 25, 305, 307, 309, 311, 359, 440, 444.)

Plaintiffs' applications were ultimately returned to the Band unadjudicated. (*Id.* ¶¶ 358, 439.) Plaintiffs assert that the Trask Descendants and other enrolled but non-San Pasqual persons were able to gerrymander the Band's government due to their powerful voting block. (*Id.* ¶ 318.) Accordingly, the Trask Descendants have been able to vote themselves into positions of power within the Band, including dismissing the Enrollment Committee that approved Plaintiffs' applications and installing an "illegal" Enrollment Committee in 2006. (*Id.* ¶ 319.) This illegal Enrollment Committee "caused" Plaintiffs' applications to be returned by the BIA, "buried" them upon their return to the Band, and wrongfully advised the BIA that Plaintiffs did not qualify. (*Id.* ¶ 320.) Since 2008, there has been a moratorium on new enrollments. (*Id.* ¶ 321.)

On October 1, 2014, and May 27, 2015, Plaintiffs filed two requests pursuant to the Freedom of Information Act to ascertain the status of their applications. (*Id.* ¶¶ 24, 44, 306, 310, 322, 361, 441, 445.) It was only through their FOIA requests that Plaintiffs discovered Dutschke's determination and the April 7, 2006, letter. (*Id.*) It was also through the FOIA requests that Plaintiffs learned that twenty-two of their cousins were enrolled by the Band and federally recognized in 2005. (*Id.* ¶¶ 315, 377, 453.)[4]

Plaintiffs' filing of the complaint in Case No. 16-CV-2442 has only exacerbated tensions between the Trask Descendants and Plaintiffs. (*See Alegre II* Comp. ¶ 232.) On April 9, 2017, a General Council meeting took place on the reservation where the Trask Descendants moved to implement a new moratorium on enrollment until a new enrollment ordinance can be put in place. (*Id.* ¶¶ 31, 232.) Plaintiffs assert the new ordinance will remove federal government oversight of the enrollment process. (*Id.* ¶ 232.) Plaintiffs fear that if this occurs, the Trask Descendants can take action to deny Plaintiffs enrollment and/or disenroll those already enrolled in the Band. (*Id.* ¶¶ 232, 239.) Should such occur, Plaintiffs will have no recourse with the U.S. government or the courts. (*Id.* ¶ 240.)

---

[4] Eighteen of these cousins are the plaintiffs in the newest of the companion cases, *Alvarado v. United States*, Case No. 17-CV-1149.

17-CV-0938-AJB-KS

Plaintiffs instituted Case No. 16-CV-2442 ("*Alegre I*") on September 28, 2016. Defendants moved to dismiss the complaint, and in response, Plaintiffs filed the amended and operative complaint. (*Alegre I*, Doc. No. 13.) Thereafter, on May 8, 2017, Plaintiffs filed the complaint in Case No. 17-CV-0938 ("*Alegre II*") seeking preliminary injunctive relief to prevent Defendants from taking any action to approve any proposed changes to the Band's Constitution and/or enrollment process or procedures while *Alegre I* is pending. The Court granted Plaintiffs a temporary restraining order on May 18, 2017. On June 8, 2017, Plaintiffs' cousins filed the complaint in Case No. 17-CV-1149 ("*Alvarado*").

On June 12, 2017, Defendants moved to dismiss the amended complaint in *Alegre I*. That motion is fully briefed. Shortly thereafter, on June 19, 2017, Defendants moved to dismiss *Alegre II* or, in the alternative, deny Plaintiffs' request for preliminary injunction. That matter is also fully briefed. Plaintiffs filed motions to consolidate in all three cases on July 17, 2017. Defendants oppose the motions to consolidate. This order follows.

## LEGAL STANDARDS

### I. *Rule 8(a) Dismissal*

Rule 8 requires that a pleader set forth "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Dismissal on Rule 8 grounds is appropriate where the complaint is "argumentative, prolix, replete with redundancy, and largely irrelevant," *McHenry v. Renne*, 84 F.3d 1172, 1177 (9th Cir. 1996), "verbose, confusing and almost entirely conclusory," *Nevijel v. N. Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981), or where it is "impossible to designate the cause or causes of action attempted to be alleged in the complaint," *Schmidt v. Herrmann*, 614 F.2d 1221, 1223 (9th Cir. 1980). Further, the Ninth Circuit has "affirmed dismissal with prejudice for failure to obey a court order to file a short and plain statement of the claim as required by Rule 8 . . . ." *McHenry*, 84 F.3d at 1178 (citing *Schmidt*, 614 F.2d at 1223–24; *see also Nevijel*, 651 F.2d at 673 ("A complaint which fails to comply with rules 8(a) and 8(e) may be dismissed with prejudice pursuant to rule 41(b).").

//

## II.    Rule 12(b)(1) Dismissal for Lack of Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Accordingly, "[a] federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989). In civil cases, federal courts have subject matter jurisdiction over only those cases where either diversity jurisdiction or federal question jurisdiction exists. *See Peralta v. Hispanic Bus., Inc.*, 419 F.3d 1064, 1068–69 (9th Cir. 2005). Diversity jurisdiction exists where the amount in controversy exceeds $75,000 and is between citizens of different states. 28 U.S.C. § 1332. Federal question jurisdiction exists in cases that arise under federal law. *Id.* § 1331.

Pursuant to Rule 12(b)(1), a party may seek dismissal of an action for lack of subject matter jurisdiction "either on the face of the pleadings or by presenting extrinsic evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). Where the party asserts a facial challenge, the court limits its inquiry to the allegations set forth in the complaint. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Where the party asserts a factual challenge, the court may consider extrinsic evidence demonstrating or refuting the existence of jurisdiction without converting the motion to dismiss into a motion for summary judgment. *Id.* The party asserting subject matter jurisdiction has the burden of persuasion for establishing it. *Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010).

## III.    Rule 42(a) Motion to Consolidate

Pursuant to Rule 42(a), the Court may consolidate cases involving common questions of law or fact to avoid unnecessary costs and delay:

> If actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue any other orders to avoid unnecessary cost or delay.

Fed. R. Civ. P. 42(a). The Court has broad discretion in ordering consolidation. *Investors*

*Res. Co. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 877 F.2d 777, 777 (9th Cir. 1989).

DISCUSSION

## I. The amended complaint in Alegre I *is subject to dismissal under Rule 8(a).*

Defendants set forth several bases for dismissing the fourteen causes of action, including that the complaint violates Rule 8(a). (Doc. No. 20.)[5] The Court finds dismissal pursuant to Rule 8(a) is appropriate. The amended complaint is nearly 250 pages long, with some 600 pages of exhibits attached.[6] While excessive length alone does not run afoul of Rule 8(a), *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131 (9th Cir. 2008), that the amended complaint is "argumentative, prolix, replete with redundancy, and largely irrelevant" does, *McHenry*, 84 F.3d at 1177.

In its current state, the amended complaint is unwieldy, poorly pled, and fails to present a succinct and straightforward statement alleging the wrongdoings of each Defendant. Over the course of 538 paragraphs, the amended complaint takes the reader through centuries of interaction between the Band, Spanish missionaries, and the United States. But it does not do so in a methodological fashion. Rather, the complaint jumps from allegations of misconduct in the present day (including Defendants' purportedly incorrect blood degree determination relating to Modesta and the Trask Descendants' ascent to power within the Band) to the spread of Christianity to the Native Americans in the 1700s and 1800s to the Trask Ancestors' appearance on the Band's lands in the late 1800s to the promulgation of enrollment rules in the mid-1900s to present day misconduct (again).

---

[5] All citations in this section are to the docket in *Alegre I* unless otherwise noted.

[6] For comparison purposes, the operative complaint in *Alto v. Salazar*, which dealt with the disenrollment of the Alto Descendants from the Band, was 33 pages long with a little over 200 pages of exhibits. (Case No. 11-CV-2276, Doc. No. 50.) While the factual circumstances surrounding the Alto Descendants' disenrollment are not identical to the issues presented in Plaintiffs' case, the *Alto* complaint demonstrates that tribal membership issues can be pled in a more succinct fashion.

17-CV-0938-AJB-KS

In addition to being verbose, the complaint is replete with repetition. For example, the allegation that the United States added the § 48.5(f) loophole to the Proposed Rule governing Enrollment of the San Pasqual Band of Mission Indians in California after the Band's approval of the rule and without notice to the Band appears in the complaint four times. (*Alegre I* Comp. ¶¶ 60, 255, 258, 408.) Various subsections of § 48 are quoted multiple times. (*Id.* ¶¶ 12, 13, 14, 17, 43, 61, 256, 299, 300, 302, 303, 308, 397, 409, 412, 415, 436, 439, 443.) The following facts, among many, also appear repeatedly throughout the complaint: the Enrollment Committee unanimously voted that Plaintiffs substantiated the blood degree increase for Modesta, (*id.* ¶¶ 7, 295, 357, 431); the General Council agreed with the Enrollment Committee's determination, (*id.* ¶¶ 9, 40, 297, 433); the Business Committee wrote to Fletcher and concurred with the Enrollment Committee and General Council, (*id.* ¶¶ 10, 41, 298, 434); Fletcher and Dutschke both determined that the evidence proffered did not substantiate a blood degree change, (*id.* ¶¶ 5, 13, 14, 42, 303, 358, 439); and Plaintiffs did not receive notification of any of Defendants' determinations concerning Modesta's blood degree, (*id.* ¶¶ 14, 15, 16, 17, 18, 25, 42, 305, 307, 309, 311, 359, 361, 440, 442, 444).[7]

Compounding the confusion is the fact that it is difficult to distinguish which statutes Plaintiffs rely upon as the basis for Defendants' waiver of sovereign immunity as to each cause of action. For example, Plaintiffs invoke the Administrative Procedure Act for the first through third and ninth through eleventh causes of action, but ask for relief the Court has no power to grant under the APA. *Alto v. Black*, 738 F.3d 1111, 1127 (9th Cir. 2013) (stating that the relief available under the APA is "affirmation, reversal or remand of the agency action"). Similarly, Plaintiffs purportedly invoke the Federal Tort Claims Act for the fourteenth cause of action, but the FTCA does not waive sovereign immunity for claims

---

[7] For additional examples of the many redundancies that litter the amended complaint, one need only look to the Background section of this order and the multiple paragraphs cited for many of the facts included.

of fraud and misrepresentation. 28 U.S.C. § 2680(h) (exempting misrepresentation and deceit from the FTCA's waiver of immunity); *Owyhee Grazing Ass'n v. Field*, 637 F.2d 694, 697 (9th Cir. 1981) ("[C]laims against the United States for fraud or misrepresentation by a federal officer are absolutely barred by 28 U.S.C. § 2680(h).").

Finally, Plaintiffs have named eight separate defendants, but each cause of action is brought against "all Defendants." Yet the 538-paragraph complaint is devoid of any factual allegations against, for example, Zinke, Black, and Loudermilk. "Something labeled a complaint but written more as a press release, prolix with evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint." *McHenry*, 84 F.3d at 1180. The Court will therefore not require these Defendants to answer a complaint bereft of allegations of wrongdoing. *See Davis v. Adler*, No. 17cv387-AJB-JLB, 2017 WL 1496467, at *2 (S.D. Cal. Apr. 26, 2017) (dismissing complaint under Rule 8(a) in part because it "impermissibly groups all of the Defendants together without distinguishing between the alleged conduct of each Defendant" and thus "fail[ed] to put the opposing party on notice of the wrong they allegedly committed so that they can adequately defend themselves"); *Adobe Sys. Inc. v. Blue Source Grp., Inc.*, 125 F. Supp. 3d 945, 964 (N.D. Cal. Aug. 31, 2015) ("As a general rule, when a pleading fails to allege what role each Defendant played in the harm, this makes it exceedingly difficult, if not impossible, for individual Defendants to respond to Plaintiffs' allegations." (citation and internal quotation marks omitted)).

For all these reasons, the Court **DISMISSES** the amended complaint pursuant to Rule 8(a). Requiring Defendants to plead or otherwise answer the voluminous complaint imposes upon them "the onerous task of combing through [plaintiffs' lengthy complaint] just to prepare an answer that admits or denies such allegations, and to determine what claims and allegations must be defended or otherwise litigated." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1059 (9th Cir. 2011). The Court itself is "busy enough without having to penetrate a tome approaching the magnitude of *War and Peace*

17-CV-0938-AJB-KS

to discern [Plaintiffs'] claims and allegations." *Id.* The onus is properly placed on Plaintiffs' shoulders to succinctly set forth the basis for their claims.

The Court notes that Plaintiffs attached a proffered second amended complaint to their opposition. (*See* Doc. Nos. 28-3–28-93.) The Court offers no opinion on whether that amendment passes muster under this order, but Plaintiffs are strongly advised to ensure their next iteration of the complaint comports with Rule 8(a). To do so, Plaintiffs must (1) succinctly set forth the facts that serve as the basis for their claims (as illustrated by the Facts section of this order); (2) delineate each Defendant's role in the wrongs perpetuated against Plaintiffs; and (3) state the basis for the Court's subject matter jurisdiction and Defendants' waiver of sovereign immunity as to each cause of action. Failure to comply with Rule 8(a) may result in dismissal with prejudice under Rule 41(b). *See Cal. Coalition for Families & Children v. San Diego Cty. Bar Ass'n*, No. 13-cv-1944-CAB (JLB), 2014 WL 12662937, at *4 (S.D. Cal. July 9, 2014) (dismissing complaint with prejudice for failing to comply with Rule 8), *aff'd*, 657 F. App'x 675 (9th Cir. 2016).

## II. *The Court lacks subject matter jurisdiction in* **Alegre II** *because Defendants have not waived sovereign immunity.*

Defendants argue dismissal is appropriate on the basis that the Court lacks subject matter jurisdiction. Specifically, Defendants contend that because there has been no final agency action, the United States has not waived sovereign immunity.[8] (Doc. No. 16-1 at 11–15.)[9] Plaintiffs respond that there is final agency action, namely, the BIA's April 7, 2006, letter denying the change to Modesta's blood degree. (Doc. No. 23 at 13.) Plaintiffs further argue that even if there is no such action, "Defendants' violation of statutory

---

[8] The United States alternatively argues that (1) the Court lacks subject matter jurisdiction because Plaintiffs' claim is not constitutionally or prudentially ripe; and (2) even if the Court finds it has subject matter jurisdiction, Plaintiffs cannot carry their burden of demonstrating the four *Winter* requirements tip in their favor. (Doc. No. 16-1 at 15–23.) Because the Court finds Defendants' first argument sufficient to grant its motion and dissolve the TRO, the Court does not reach the latter two arguments.

[9] All citations in this section are to the docket in *Alegre II* unless otherwise noted.

mandates and Plaintiffs' civil rights give this Court the jurisdiction to issue a prospective [preliminary or permanent injunction] because this Court can issue an Injunction based on a federal question." (*Id.* at 10.)

Where suit is brought against the United States, federal courts have no jurisdiction absent the United States' consent to be sued. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980); *see also Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985) ("[A] suit against [federal] employees in their official capacity is essentially a suit against the United States."). Certain federal statutes provide limited exceptions to this general rule. Here, Plaintiffs invoke the Administrative Procedure Act ("APA"). (*See* Doc. No. 23 at 11–13 (plaintiffs arguing that "[t]his Court has jurisdiction to review agency action under the APA even when the agency applies tribal law").)

"The APA permits a citizen suit against an agency when an individual has suffered 'a legal wrong because of agency action' or has been 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Rattlesnake Coal. v. U.S. E.P.A.*, 509 F.3d 1095, 1103 (9th Cir. 2007) (quoting 5 U.S.C. § 702)). When a lawsuit is brought pursuant to the APA, the agency action sued upon must be "final agency action for which there is no other adequate remedy in a court . . . ." 5 U.S.C. § 704. In other words, "[t]he APA applies to waive sovereign immunity ***only*** after final agency action." *Rattlesnake Coal.*, 509 F.3d at 1104–05 (emphasis added). An agency action is considered "final" for purposes of the APA "when (1) the agency reaches the 'consummation' of its decisionmaking process and (2) the action determines the 'rights and obligations' of the parties or is one from which 'legal consequences will flow.'" *Id.* at 1103 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

In this case, Plaintiffs seek injunctive relief preventing Defendants from taking any action to approve a proposed amendment to the Band's Constitution and/or enrollment criteria and/or procedures that remove federal government oversight from the enrollment process. Defendants contend the Court lacks subject matter jurisdiction over this claim because there is no final agency action. (Doc. No. 16-1 at 13–15.) Defendants support their

position with a declaration from Harley Long. (Doc. No. 16-2.) Long is the Tribal Government Officer for the BIA, Pacific Region, in the United States Department of the Interior. (*Id.* ¶ 1.) Long oversees tribal operations for the Pacific Region and its four agencies that serve the tribes located in the State of California, including the Band. (*Id.*)

In his capacity as Tribal Government Officer, Long is responsible for overseeing the process for review and approval of new and amended tribal constitutions. (*Id.* ¶ 2.) Long attests that, pursuant to the Band's Constitution, the following procedure must be followed before an amendment to the Constitution becomes effective. (*See id.* ¶¶ 4–6.) First, an amendment proposing a change requires a majority of the Band's General Council to request that the BIA hold a Secretarial election to vote on the amendment. (*Id.* ¶ 6.) Next, the BIA must schedule the election, in which at least 30% of the Band's eligible members must participate, a majority of whom must vote in the amendment's favor. (*Id.*) Following the Secretarial election, the BIA is required to resolve any challenges brought by eligible voters to the election results. (*Id.* ¶ 9.) The BIA would then determine if the election met the standards of the Band's Constitution or conflicted with federal law before approving the election. (*Id.* ¶¶ 9–10.) It is the BIA's approval or disapproval of the results of a Secretarial election that constitutes a final agency action pursuant to 25 C.F.R. § 81.45(f).[10]

It is the last step of this process—the BIA's approval of a Band election approving a constitutional amendment—that Plaintiffs seek to enjoin through this complaint. It is undisputed, however, that the BIA has not taken any such action. (Doc. No. 16-2 ¶ 7.) In fact, the BIA has not received any indication that the Band is considering amending its Constitution. (*Id.*) Plaintiffs' own position admits there is no final agency action with respect to a constitutional amendment: "[T]he tribal council has not yet petitioned the

---

[10] This section states, "The Authorizing Official's decision to approve or disapprove the governing document or amendment is a final agency action." 25 C.F.R. § 81.45(f).

Defendants for a change in their Constitution and enrollment procedures and criteria[.]"[11] (Doc. No. 23 at 11.) Under controlling authority, it is beyond debate that the lack of final agency action renders the Court without subject matter jurisdiction. *City of San Diego v. Whitman*, 242 F.3d 1097, 1101 (9th Cir. 2001) ("Until the administrative appeal process is completed, judicial review is premature.").

Plaintiffs' evidence demonstrates that at a General Council meeting, a motion was made to put in place a new enrollment ordinance, which will remove BIA oversight from the Band's enrollment process. (Doc. No. 23-2 ¶¶ 5–6; Doc. No. 23-3 ¶¶ 3–6; Doc. No. 23-4 ¶¶ 3–6; Doc. No. 23-9 ¶¶ 3–6.) Plaintiffs' evidence also demonstrates, however, that none of the steps necessary to implement such a change to the Band's Constitution have occurred. It is possible for a proposed amendment to fail at any of the many steps that must be taken prior to an amendment becoming effective. Should it fail, judicial review will be completely unnecessary, underscoring the need for final agency action in this case. *Sierra Club v. U.S. Nuclear Regulatory Comm'n*, 825 F.2d 1356, 1362 (9th Cir. 1987) ("We will not entertain a petition where pending administrative proceedings or further agency action might render the case moot and judicial review completely unnecessary.").

Notwithstanding their concession, Plaintiffs assert there is final agency action that gives this Court jurisdiction. (Doc. No. 23 at 13–14.) Specifically, Plaintiffs point to the BIA's letter dated April 7, 2006, in which the BIA determined there is insufficient evidence to warrant an increase to Modesta's blood degree. (*Id.* at 13; *see Alegre I*, Doc. No. 13-6 at 2.) Because this letter constitutes final agency action, Plaintiffs assert the Court has subject matter jurisdiction to review the following:

> 1) April 7, 2006 denial of the Band's request to increase Modesta (Martinez) Contreras' blood degree from 3/4 to 4/4; 2) Failure to give Plaintiffs notice of this decision; 3) Failure to follow statutory mandates under 25 CFR §48 to

---

[11] The only thing that has occurred thus far is a General Council meeting, which occurred on or about April 9, 2017. (Doc. No. 23 at 5.) This is the first of the multi-step process outlined above.

review and adjudicate Plaintiffs legally approved applications; and 4) Failure to notify Plaintiffs they returned their applications to the Band without adjudicating or reviewing them.

(Doc. No. 23 at 13.) Plaintiffs contend that given the Court's jurisdiction over these issues, the Court has jurisdiction pursuant to 5 U.S.C. § 705 to grant the injunctive relief they seek here. (*Id.* at 14.)

Not so. Like § 704, § 705 requires final agency action before the Court can grant such relief. Section 705 provides the following:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, **the reviewing court**, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705 (emphasis added). Plaintiffs rely on the last portion of this section for the assertion that the Court has jurisdiction to grant injunctive relief "to preserve status or rights pending conclusion of the review proceedings" while the disputes in the companion cases are resolved. (Doc. No. 23 at 14.) Plaintiffs' interpretation of § 705, however, is belied by the *Attorney General's Manual on the Administrative Procedure Act*:

> The "reviewing court" in which section 10(d) vests the power to stay agency action is the court, and only that court, which has obtained jurisdiction to review the final agency action in accordance with subsections (b) and (c) and the applicable provisions of particular statutes. Section 10(d) confers no power upon a court in advance of the submission to it of final agency action for review on the merits. See *Federal Power Commission v. Metropolitan Edison Co.*, 304 U.S. 375, 383 (1938). This is the only logical conclusion to be drawn from the employment of the phrase "reviewing court", rather than "any court." Any other construction would twist section 10(d) into a general grant of power to the Federal courts to review all kinds of questions presented by preliminary and intermediate agency action.

*Id.* at 106, available at https://ia600406.us.archive.org/30/items/AttorneyGeneralsManual OnTheAdministrativeProcedureActOf1947/AttorneyGeneralsManualOnTheAdministrati veProcedureActOf1947.pdf.

The Court agrees with Defendants that the only reasonable interpretation of § 705 is that contained in the *Attorney General's Manual*. First, "[t]he Supreme Court has accorded deference to the interpretations of APA provisions contained in the *Attorney General's Manual*, both because it was issued contemporaneously with the passage of the APA and because of the significant role played by the Justice Department in drafting the APA." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1012 n.7 (9th Cir. 1987) (citing *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 546 (1978)). Second, even without the guidance contained in the *Attorney General's Manual*, giving § 705 the jurisdictional reach Plaintiffs argue it has would be inconsistent with the restriction on jurisdiction contained in § 704. It is a basic tenant of statutory construction that the courts must "avoid inconsistency" and "superfluity and nullities." *In re Loretto Winery Ltd.*, 898 F.2d 715, 722 (9th Cir. 1990). Accordingly, the Court will not interpret § 705 in such a way that renders it inherently inconsistent with § 704.

Plaintiffs appear to argue that the Court has subject matter jurisdiction because Plaintiffs can satisfy the test for preliminary injunctive relief and because they are seeking to maintain the status quo. (Doc. No. 23 at 15–19.) As to the former assertion, Rule 65 is not a jurisdictional statute; rather, it deals with the procedures for obtaining preliminary injunctive relief. Even if Plaintiffs are likely to succeed on their suit or even if the degree of irreparable harm they could face absent interim relief is significant, the Court is simply not permitted to entertain merits-based questions in the absence of subject matter jurisdiction: "'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).

As to the latter assertion, the issue before the Court is not merely a question of exhaustion of administrative remedies. Exhaustion of administrative remedies is often nonjurisdictional in nature. *Cf. Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515–16 (2006) ("If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. . . . But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."). In contrast, final agency action is necessary for there to be a waiver of sovereign immunity under the APA. Absent such a waiver, courts are without jurisdiction to entertain suits against the United States. *Rattlesnake Coal.*, 509 F.3d at 1105 ("Before final agency action has occurred, an action against the [United States] is premature and a federal court lacks subject matter jurisdiction to hear the claim."). For this reason, the Court finds Plaintiffs' proffered cases to the contrary uninformative and unpersuasive.[12]

In sum, the Court finds there is no final agency action with regard to a proposed amendment to the Band's Constitution. Accordingly, the Court lacks subject matter jurisdiction over this particular claim. On this basis, the Court **GRANTS** Defendants' motion to dismiss, (Doc. No. 16), and **DISMISSES** the complaint in Case No. 17-CV-0938, (Doc. No. 1). The Court also **DISSOLVES** the TRO it entered on May 18, 2017. (Doc. No. 7.) Unless and until Defendants take final agency action to approve an amendment to the Band's Constitution, Plaintiffs cannot bring a claim seeking to enjoin such action.

### III. *The cases are subject to consolidation under Rule 42(a).*

Plaintiffs ask the Court to consolidate the three companion cases. Plaintiffs argue consolidation is appropriate because there are many common questions of law and fact,

---

[12] This is particularly so given that none of the cases deal with claims against the United States and thus do not address the issue of sovereign immunity and its impact on a court's subject matter jurisdiction.

consolidation will promote efficiency and convenience given the three cases' shared factual background, and consolidation will not delay the cases' disposition. Defendants oppose Plaintiffs' motion, arguing that the claims are not identical and that Plaintiffs' request is premature given the procedural postures of each of the three cases.

Having reviewed the parties' respective positions, the Court finds consolidation is appropriate. Consolidating the cases will permit the parties to submit motions in only the lead case as opposed to, for example, filing motions to dismiss in all three cases on overlapping grounds.[13] Furthermore, the Court's omnibus order ameliorates the concerns Defendants raise in their opposition to Plaintiffs' request to consolidate. Specifically, the Court has already granted Defendants' motion to extend the time for filing a responsive pleading in *Alvarado*. Given that the Court is issuing a single order addressing the motions to dismiss in the two *Alegre* cases, consolidating the cases permits Plaintiffs the opportunity to file a consolidated complaint, setting forth all of their claims in a single pleading. As such, all three cases will be at the same procedural position.

For these reasons, the Court exercises its broad discretion under Rule 42(a) and **GRANTS** Plaintiffs' motions to consolidate. Case Nos. 17-CV-0938 (*Alegre II*) and 17-CV-1149 (*Alvarado*) are hereby consolidated with Case No. 16-CV-2442 (*Alegre I*). *Alegre I* is the lead case; accordingly, all filings will be in that case.

### CONCLUSION

In sum, the Court rules as follows. In ***Case No. 16-CV-2442***, the Court **GRANTS** Defendants' motion, (Doc. No. 20), and **DISMISSES** the amended complaint, (Doc. No. 13), pursuant to Rule 8(a). In ***Case No. 17-CV-0938***, the Court **GRANTS** Defendants' motion, (Doc. No. 16), **DISMISSES** the complaint, (Doc. No. 1), pursuant to Rule 12(b)(1), and **DISSOLVES** the temporary restraining order, (Doc. No. 7). In all three cases, the Court **GRANTS** Plaintiffs' motions to consolidate.

---

[13] While no motion practice has occurred in *Alvarado* yet, Defendants have already represented that a motion to dismiss is likely. (Case No. 17-CV-1149, Doc. No. 10 ¶ 3.)

Plaintiffs are **ORDERED** to file a consolidated complaint in the lead case, Case. No. 16-CV-2442. This consolidated complaint must be filed no later than ***thirty days*** after this order's issuance. Defendants must file a responsive pleading no later than ***thirty days*** after the consolidated complaint is filed.[14]

**IT IS SO ORDERED.**

Dated:  August 15, 2017

Hon. Anthony J. Battaglia
United States District Judge

---

[14] The Court notes that both sides either filed overlong moving papers without leave of Court or filed a request for leave to exceed the page limits concurrent with the overlong moving papers. In all future filings in this case, the parties must seek the Court's leave to exceed the page limits **prior** to filing overlong briefing. Failure to do so will result in filings being rejected.